IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SIERRA CLUB, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:23-cv-00919 |
| ) | |
| PRAIRIE STATE GENERATING ) | |
| COMPANY, LLC., ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT**

**INTRODUCTION**

1. This is a citizen enforcement suit brought by a non-profit organization, on behalf of its members, against Defendant Prairie State Generating Company, LLC ("Prairie State" or "PSGC") for violating the Clean Air Act at its coal-fired power plant, Prairie State Energy Campus ("PSEC" or "Power Plant"), located in Washington County, Illinois.

2. PSEC is a 1,600-MW coal-fired power plant. In 2010, PSGC applied for an operating permit from the Illinois Environmental Protection Agency ("Illinois EPA") as a major stationary sources of air pollution under the Clean Air Act. A Clean Air Act operating permit (termed a "Title V" permit under federal law or a "CAAPP Permit" under Illinois law) imposes mandatory and enforceable emission limits as well as monitoring, reporting, and other requirements. Illinois EPA never issued a permit. In January 2012, the statutory period under Illinois law for Illinois EPA to issue a permit expired, and so the permit was constructively denied.

1

3. Despite this constructive denial, PSGC continued to operate PSEC and has done so almost continuously since June 2012, at all times without an operating permit.

4. Over the past ten years, PSEC has emitted tens of millions of tons of carbon dioxide, thousands of tons of sulfur dioxide and nitrogen oxides, and hundreds of tons of particulate matter, all in violation of the Clean Air Act's permitting requirement. These pollutants have threatened and continue to threaten the health of Sierra Club members and their enjoyment of nature.

5. Sierra Club is bringing this litigation to stop PSGC's continued unlawful operation of PSEC without an operating permit. Sierra Club seeks to protect its members and everyone affected by PSEC's air pollution emissions by ensuring PSGC is subject to, and complies with, the monitoring requirements and emission limitations to be set forth in an operating permit. Until and unless Illinois EPA issue such a permit, PSGC is operating PSEC unlawfully.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action under 42 U.S.C. § 7604(a)(1) (Clean Air Act citizen suit provision) and 28 U.S.C. § 1331.

7. On October 19, 2022, Plaintiff sent a letter (the "Notice Letter") by certified mail, to Randy Short, President and Chief Executive Officer of Prairie State Generating Company, and to Helen Gallagher, the registered agent for Prairie State Generating Company in Illinois. A copy of the Notice Letter is attached as Exhibit A and is incorporated by reference herein. The Notice Letter was received at Prairie State Generating Company on October 24, 2022.

8. On October 19, 2022, Plaintiff sent a copy of the Notice Letter by certified mail to Michael Regan, Administrator for the United States Environmental Protection Agency ("U.S.

EPA"); Debra Shore, Regional Administrator for U.S. EPA Region 5; and Governor J.B. Pritzker. The letter was received by the U.S. EPA and Governor Pritzker's office on October 24 and 25, respectively. Delivery of the letter to the Regional Administrator could not be confirmed by the United States Postal Service ("USPS"). Plaintiff sent a second copy of the letter on November 14, 2022. USPS confirmed delivery of this second copy on November 21, 2022.

9. On January 6, 2023, Plaintiff sent copies of the Notice Letter by certified mail to John J. Kim, Director of the Illinois EPA, and Julie Armitage, Director of the Bureau of Air of the Illinois EPA. These copies were received on January 17, 2023.

10. The Notice Letter satisfies the pre-suit notice requirements of the Clean Air Act, as set forth in 42 U.S.C. § 7604(b) and 40 C.F.R. §§ 54.2, 54.3. More than sixty days have passed since the Notice Letter was mailed to the recipients listed in paragraphs 7, 8, and 9.

11. As of the date of the filing of this Complaint, neither the U.S. EPA nor the State of Illinois has commenced and is diligently prosecuting a civil action in federal or state court to enforce the Clean Air Act violations that Plaintiff is alleging. Neither U.S. EPA nor the State of Illinois has taken regulatory action sufficient to remedy Prairie State's violations or order Prairie State to cease operations at the Power Plant until a permit is issued. Prairie State's violations have been repeated and Prairie State continues to violate the Clean Air Act. At or around the time this Complaint was filed, Plaintiffs served a copy of it on the U.S. Attorney General and the Administrator of the U.S. EPA, pursuant to 42 U.S.C. §7604(c).

12. The relief requested is authorized by 28 U.S.C. §§ 2201(a) and 2202, and 42 U.S.C. § 7604(a), (d), and (g).

13. Venue is proper in the District Court for the Southern District of Illinois pursuant to 42 U.S.C. § 7604(c) and 28 U.S.C. § 1391. Plaintiffs have offices and members within the

Southern District of Illinois. The Power Plant and PSGC's offices are located within the Southern District of Illinois. The complained-of emissions are occurring in the Southern District of Illinois.

## PARTIES

I. PLAINTIFF

14. Plaintiff Sierra Club is the United States' largest grassroots environmental organization, with more than 730,000 members nationwide, including more than 27,000 members in Illinois. The Sierra Club is dedicated to the enjoyment and protection of the Earth's wild places; to ensuring we can breathe clean air so that healthy communities and wild places thrive; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objections.

15. Sierra Club is a "person" within the meaning of the Clean Air Act's citizen suit provision, 42 U.S.C. §§ 7604(a); 7602(e).

16. To fulfill its mission, goals, and purposes, Plaintiff Sierra Club has worked, and continues to work, to prevent the construction of PSEC and to limit its unhealthy air pollution, its contribution to climate change, and its adverse impact on Illinois' and neighboring states' natural environments. Sierra Club has attempted to ensure PSGC fully complies with environmental laws, including the Clean Air Act, and that it reduces emissions of criteria pollutants including nitrogen oxides, sulfur dioxide, particulate matter, and other precursors to ozone formation. The interests that Plaintiff Sierra Club seeks to protect through this lawsuit are germane to its missions, goals, and purposes. Individual members are not needed to pursue claims under the Clean Air Act or secure requested remedies.

17. Plaintiff's members live on, enjoy, and conduct activities in proximity to PSEC, within view of the Power Plant, and within areas adversely impacted by the Power Plant's emissions, including areas harmed by Prairie State's emissions of sulfur dioxide, nitrogen oxides, particulate matter, and other criteria pollutants. For example, members live and engage in routine daily activities in several towns within a 20-mile radius of the Power Plant, including Mascoutah, Illinois. Air pollution from PSEC, including emissions of particulate matter, sulfur dioxide, and nitrogen oxides, harms these members' health and reduces their enjoyment of outdoor activities. One such Sierra Club member is Dorothy Maschal, whose declaration is attached to this Complaint as Exhibit B.

18. Plaintiff's members also recreate in Mingo Wilderness, the closest Class I federally protected area to PSEC, where they kayak; view wildlife, vegetation, and wetlands; take photographs; stargaze; hike; camp; and engage in aesthetic appreciation of the area's natural beauty, wildness, and solitude. Members have enjoyed the Mingo Wilderness in this way in the past and intend to do so again in the future. Air pollution from PSEC reduces the air quality and visibility of these areas and lessens the likelihood of viewing wildlife and astronomical features. Prairie State harms Sierra Club members' recreational interests and aesthetic value in the areas impacted by the Power Plant's emissions. One such Sierra Club member is James Bensman, whose declaration is attached to this Complaint as Exhibit C.

19. Emissions from PSEC of air pollutants contribute to a reduction of air quality in the region. PSEC emits air pollutants that contribute to the formation of ground-level ozone. Ozone at ground level is itself a harmful pollutant because of its effects on people and the environment, and is the main ingredient in smog.[1]

---

[1] *See* https://ww.epa.gov/ground-level-ozone/ground-level-ozone-basics.

20. Breathing ozone pollution, sulfur dioxide, nitrogen oxides, and particulate matter causes health concerns, especially for the elderly, children, people with asthma and other respiratory problems, and those who are active outdoors. Plaintiff's members are exposed to and suffer from elevated levels of these pollutants from PSEC's emissions. PSEC's emissions of particulate matter, sulfur dioxide, and nitrogen oxides (as well as the ozone and additional particulate matter formed when these chemicals react in the atmosphere) detract from members' use and enjoyment of recreational areas near the Power Plant and other impacted areas, including Mingo Wilderness, and cause Sierra Club members to have concern for their health.

21. Ozone pollution contributes to haze. Haze impairs visibility, is an aesthetic problem, and detracts from recreation activities. Haze in areas affected by Prairie State's air pollution has impaired visibility, reduces members' enjoyment of the aesthetics in Mingo Wilderness, and detracts from Sierra Club members' recreational activities.

22. Ozone pollution adversely affects wildlife and vegetation. Plaintiff's members view and enjoy wildlife and vegetation and have an interest in viewing and enjoying wildlife and vegetation in areas affected by PSEC's pollution. PSEC's emissions reduce members' ability to see and enjoy wildlife and vegetation in the affected areas.

23. Plaintiff's members are concerned about the health impacts of living in proximity to PSEC. Modeling using AERMOD and publicly available emissions data as reported by Prairie State show the Power Plant has elevated ambient levels of sulfur dioxide by a significant degree throughout the 50-kilometer modeling domain. That same modeling shows Prairie State has raised ambient concentrations of nitrogen dioxide by a significant amount in much of the surrounding region, including in and around Mascoutah, Illinois. Elevated concentration levels of

sulfur dioxide and nitrogen oxide are associated with increased adverse respiratory events such as asthma attacks and decreased lung function.

24. Defendant's illegal operation and air pollution detract from Plaintiff's members' use and enjoyment of recreational areas impacted by air pollution from PSEC, expose members to higher levels of air pollutants than they otherwise would be exposed to, and make Plaintiffs' members concerned for their health.

25. Sierra Club and its members review emission monitoring information from air pollution sources as part of their efforts to advocate for and achieve clean air, including in areas affected by PSEC's emissions. By not having the required operating permit, which ensures Prairie State sufficiently monitors and discloses the Power Plant's air emissions, Plaintiff and its members are deprived of the opportunity and ability to review and use the pollution data from PSEC as part of these efforts. The lack of complete information about PSEC's air emissions means Plaintiffs' members do not know the full extent of the harmful health effects of the Power Plant.

26. A favorable decision and the requested relief, including declaratory and injunctive relief and civil penalties, will redress these injuries to Plaintiff's members. If Prairie State had the required permit and limits on air emissions for PSEC based on the most stringent current regulations, emissions would be reduced, Plaintiff's members' concern for their health would be lessened, and Plaintiff's members' enjoyment and use of Mingo Wilderness and other nearby areas would be enhanced. The requested relief will allow members to breathe air free of the Power Plant's unpermitted and harmful air emissions, allow them to view natural scenery and wildlife less impaired by Prairie State's emissions, protect the region's natural ecology from air pollution from PSEC, and provide members with information about PSEC's air pollution.

## II. DEFENDANT

27. Defendant Prairie State Generating Company, LLC ("PSGC") operates the Prairie State Energy Campus coal-fired power plant. PSGC is a Delaware corporation doing business in Illinois. PSGC is controlled by Prairie State Energy Campus Management, Inc., an Indiana non-stock, not-for profit corporation, and is owned by nine utilities: five municipal power agencies and four rural electric cooperatives. On information and belief, these nine co-owners are: American Municipal Power, Inc., an electric generation and transmission cooperative; Illinois Municipal Electric Agency, a municipal corporation and unit of local government; Indiana Municipal Power Agency, a political subdivision of the State of Indiana; Kentucky Municipal Power Agency, a joint public agency; the Missouri Joint Municipal Electric Utility Commission, a public corporation; Northern Illinois Municipal Power Agency, a municipal corporation and unit of local government; Prairie Power, Inc., an electric generation and transmission cooperative; Southern Illinois Power Cooperative, an electric generation and transmission cooperative; and Wabash Valley Power Alliance, an electric cooperative and wholesale electricity provider.

28. On information and belief, ownership of the Prairie State Energy Campus and control over its operation were established and continues to be governed by a Participation Agreement among the nine co-owning entities. On information and belief, under the terms of this Participation Agreement, PSGC is responsible for obtaining, holding, and operating the Power Plant in compliance with state and federal permits. PSGC is the named permittee for the construction permit and Prevention of Significant Deterioration permit issued for PSEC.

29. Defendant PSGC is a "person" within the meaning of the Clean Air Act, 42 U.S.C. § 7602(e).

**LEGAL BACKGROUND**

I.     CLEAN AIR ACT

30.     The Clean Air Act is a federal statute that prevents and controls air pollution. Enacted in 1970, with significant amendments in 1977 and 1990, its primary purpose is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and productive capacity of its population." 42 U.S.C. § 7401(b)(1). Title I obliges the U.S. EPA to set standards for air pollutants found to endanger public health and welfare, known as the National Ambient Air Quality Standards or NAAQS. 42 U.S.C. § 7409. EPA has established NAAQS for six "criteria" pollutants. 40 C.F.R. §§ 50 *et seq.*

31.     States work cooperatively with EPA to implement the Clean Air Act. States prepare State Implementation Plans, or SIPs, that contain a collection of rules—"enforceable emission limitations and other control measures, means, or techniques, as well as schedules and timetables for compliance"—designed to, among other things, achieve and maintain compliance with the NAAQS. 42 U.S.C. § 7410(a)(2)(A). At a minimum, SIPs are required to conform to Clean Air Act requirements. The states submit their SIPs to EPA for approval. *Id*. § 7410(k)(1)-(4). If found adequate and approved, the State SIP becomes federal law and its provisions enforceable in federal courts.

32.     The Clean Air Act includes a New Source Review (NSR) permitting program, which requires new and modified stationary sources emitting certain amounts of air pollution to install modern pollution control equipment before they are constructed. The Prevention of Significant Deterioration (PSD) program is part of the NSR permit program and specifically applies to sources located within attainment areas, *i.e.* areas where ambient concentrations of criteria pollutants have not been found to exceed the NAAQS. 42 U.S.C. § 7475. EPA has

approved Illinois's PSD program, 35 Ill. Admin. Code Part 204, as a component of the state's SIP. *See, e.g.*, 60 Fed. Reg. 49,778 (Sept. 27, 1995); 57 Fed. Reg. 59,928 (Dec. 17, 1992). The Illinois EPA administers the Illinois SIP through the Bureau of Air.

33. Under Title V of the Clean Air Act, operating permits are required for all major stationary sources. 42 U.S.C. § 7661a(a). A Title V major source is "any stationary source" that emits or has the potential to emit one hundred tons per year or more of any regulated air pollutant, including any pollutant for which U.S. EPA has promulgated a NAAQS. 42 U.S.C. § 7661(2), *citing* 42 U.S.C. § 7602(j); 415 ILCS § 5/39.5. Title V permits incorporate all "enforceable emission limitations and standard," establish "a schedule of compliance," require that "the permittee submit to the permitting authority…the results of any required monitoring," and "set forth inspection, entry, monitoring, compliance certification, and reporting requirements to assure compliance with the permit terms and conditions." 42 U.S.C. § 7661c(a), (c).

34. Each state must develop and submit to U.S. EPA for approval a Title V operating permit program that conforms to certain minimum elements established by U.S. EPA regulations. 42 U.S.C. § 7661a(d)(1); 40 C.F.R. § 70.1.

35. Under the Clean Air Act, "[i]t is unlawful for any person…to operate…a major source…except in compliance with a permit issued by a permitting authority" under an approved Title V operating permit program. 42 U.S.C. § 7661a(a).

36. The Clean Air Act's citizen-suit provision provides an enforcement mechanism for the public. 42 U.S.C. § 7604. This provision empowers "any person" to "commence a civil action on his own behalf" against "any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation . . . of an emission standard or limitation." 42 U.S.C. § 7604(a)(1). An "emission standard or limitation" is defined

10

to include provisions found in a U.S. EPA-approved SIP and "any requirement to obtain a permit as a condition of operations." 42 U.S.C. § 7604(f)(4). Courts have jurisdiction to provide injunctive relief, impose "appropriate civil penalties," order supplemental environmental projects, and award plaintiffs their litigation costs, including attorney and expert fees. 42 U.S.C. § 7604(a)(g)(2); § 7413(b) & (e); § 7604(d). *See* 40 C.F.R. § 19.4 (regulation adjusting for inflation statutory penalty amount to $117,468 per violation per day).

37. To enforce some Clean Air Act violations, a citizen-plaintiff must provide the alleged violator as well as the U.S. EPA and relevant state with written notice of the violations at least sixty days before a lawsuit is filed. 42 U.S.C. § 7604(b)(1)(A). A citizen is barred from bringing suit if EPA or the state has commenced a lawsuit and is diligently prosecuting the case in court. 42 U.S.C. § 7604(b)(1)(B).

II. ILLINOIS' CLEAN AIR ACT PERMITING PROGRAM

38. U.S. EPA approved Illinois' Title V operating permit program, which is called the Clean Air Act Permit Program, on November 30, 2001. 66 Fed. Reg. 62,949 (Nov. 30, 2001). Under Illinois' Clean Air Act Permit Program ("CAAPP"), it is "unlawful for any person…to operate any CAAPP source except in compliance with a permit issued by the Agency under this Section." 415 ILCS § 5/39.5.

39. A "CAAPP source" is defined as "any source for which the owner or operator is required to obtain a CAAPP permit." 415 ILCS § 5/39.5. All major sources are required to obtain a CAAPP permit. 415 ILCS § 5/39.5(2). Major sources under Illinois law include stationary sources that "emit[] or have the potential to emit, in the aggregate, 10 tons per year (tpy) or more of any hazardous air pollutant which has been listed pursuant to Section 112(b) of the Clean Air Act [or] 25 tpy or more of any combination of such hazardous air pollutants," and any "major

stationary source of air pollutants, as defined in Section 302 of the Clean Air Act, that directly emits or has the potential to emit, 100 tpy or more of any air pollutant subject to regulation." *Id.*

40. Owners or operators of a CAAPP source must submit a complete CAAPP application. Upon submission, the Illinois EPA is directed to provide notice to the CAAPP applicant as to whether the application is complete. If the Illinois EPA fails to notify the applicant of incompleteness within 60 days after receipt of the CAAPP application, the application shall be deemed complete. 415 ILCS § 5/39.5(5).

41. An owner or operator of a CAAPP source that has submitted a timely and complete CAAPP application may operate that source "until the Agency takes final action on the submitted CAAPP application." 415 ILCS § 5/39.5(5)(h).

42. Illinois law directs the Illinois EPA to "issue or deny the CAAPP permit within 18 months after the date of receipt of the complete CAAPP application" with certain exceptions. As relevant here, the Illinois EPA "shall act on initial CAAPP applications within 24 months after the date of receipt of the complete CAAPP application." 415 ILCS § 5/39.5(5)(j).

43. Under Illinois law, the Illinois EPA's failure to grant a CAAPP permit upon application within the specified time limits constitutes constructive denial. Illinois law defines "final permit action" to mean "the Agency's granting with conditions, refusal to grant, renewal of, or revision of a CAAPP permit, the Agency's determination of incompleteness of a submitted CAAPP application, or the Agency's failure to act on an application for a permit, permit renewal, or permit revision within the time specified in . . . paragraph (j) of subsection 5 of this section." Paragraph (j) of subsection 5 further provides that, "Where the Agency does not take final action on the permit within the required time period, the permit shall not be deemed issued; rather, the failure to act shall be treated as a final permit action for purposes of judicial review." *Id.*

**FACTUAL BACKGROUND**

44.     Prairie State Energy Campus (PSEC) is a mine-mouth coal-fired power plant with a nominal capacity of 1,600 MW. PSEC is near Marissa, Illinois, in Washington County, in an area that is designated attainment for all criteria pollutants. PSEC includes two pulverized coal boilers as its primary generation and emission units, and an auxiliary gas-fired boiler.

45.     PSEC began operation in June 2012.

46.     On information and belief, PSEC has operated continuously since June 1, 2012, with the exception of brief shutdown periods. Based on Clean Air Markets Program Data, PSEC had a gross load on every day between June 1, 2012 and December 31, 2022 except the following: 8/3/2012; 8/30/2012; 7/14/2013; 8/26/2013; 11/13/2013; 5/27/2014; 8/12/2014; 4/7/2016; 4/16/2018; 9/12/2020; 10/3/2020; 10/30/2020; 3/26/2021; 10/31/2022; 11/1/2022; and 11/2/2022. The Clean Air Markets Program Data is missing generation and emissions data for the following dates: 6/16-6/17/2012; 7/19-7/31/2012; 8/1-8/2/2012; 8/22-8/29/2012; 11/26-11/27/2012; 1/8/2013; 7/11-7/13/2013; 10/31/2013; 11/1-11/12/2013; 5/25-5/26/2014; 10/9/2014; 2/22/2015; 3/31/2016; 4/1-4/6/2016; 11/16-11/22/2016; 4/11-4/12/2017; 8/25/2017; 10/25/2017; 4/13-4/15/2018; 8/25/2020; 9/14-9/16/2020; 10/2/2020; 10/17/2020; 3/22-3/25/2021; 10/28-10/30/2022. All other days the Clean Air Markets Program Data reports PSGC generated electricity and emitted sulfur dioxide, nitrogen oxides, and carbon dioxide.

47.     PSEC continues to operate and to emit regulated air pollutants, including sulfur dioxide, particulate matter, nitrogen oxide, and carbon dioxide.

48.     PSEC is a major source under Title V of the Clean Air Act (42 U.S.C. § 7661(2); 42 U.S.C. § 7602(j)), and the Illinois Clean Air Act Permit Program, 415 ILCS § 5/39.5, as well as under the Hazardous Air Pollutants (42 U.S.C. § 7412) rules. Boilers at the plant have

potential annual emissions of sulfur dioxide, nitrogen oxides, particulate matter, carbon monoxide, volatile organic material, and sulfuric acid mist in excess of 100 tons per year. The plant has the potential to emit more than 10 tons of hydrogen fluoride and hydrogen chloride per year and more than 25 tons in aggregate for a combination of hazardous air pollutants.

49. In 2022, PSEC emitted more than 9,100 tons of sulfur dioxide and 3,700 tons of nitrogen oxides. In 2021, PSEC emitted more than 10,500 tons of sulfur dioxide and 4,100 tons of nitrogen oxides.

50. Sulfur dioxide and nitrogen oxides are regulated as "criteria" pollutants under the Clean Air Act and as "regulated air pollutants" under Illinois law. 40 C.F.R. §§ 50.4, 50.11; 415 ILCS § 5/39.5.

51. Sulfur dioxide is harmful to public health. According to the EPA, sulfur dioxide can cause adverse respiratory effects during even brief exposures. 84 Fed. Reg. 9,866, 9,874 (Mar. 18, 2019). Sulfur dioxide exposure can exacerbate asthma, inducing cough, shortness of breath, chest tightness, and wheeze. *Id*. at 9,875. Sulfur dioxide is also a major contributor to acid rain, which harms plants and may lead to the acidification of bodies of water.

52. Nitrogen oxides are also harmful to public health. According to the EPA, short-term nitrogen oxide exposure exacerbates asthma in humans. 83 Fed. Reg. 17,226, 17,227 (Apr. 18, 2018). Nitrogen oxides also react with water and oxygen in the atmosphere to form acid rain. Nitrogen oxides contribute to the formation of ground-level ozone. Ozone causes adverse respiratory symptoms, including coughing, lung and airway inflammation, and increased asthma attacks in people who have asthma. According to the U.S. EPA, both short- and long-term exposure to ozone in ambient air is associated with airway and lung inflammation, increased

asthma attacks, respiratory-related hospital visits, and premature deaths due to both respiratory and cardiovascular impacts. 80 Fed. Reg. 65,292, 65,303-09 (Oct. 26, 2015).

53. Both sulfur dioxide and nitrogen oxides are highly reactive and react with other chemicals in the atmosphere to form fine particles of diameter less than 2.5 micrometers in diameter. When such fine particles are inhaled by humans, they can embed deep within the lungs or enter the bloodstream. According to the U.S. EPA, inhalation of particle pollution is associated with increased cardiovascular symptoms, hospital visits, and premature mortality, even with only short-term elevated exposure. 78 Fed. Reg. 3,085, 3,103 (Jan. 15, 2013). Fine particles are also the main cause of haze in the United States, and cause reduced visibility.

54. PSEC also directly emits tons of these fine particles (known as "particulate matter" or "PM2.5") each year.

55. PSEC has also emitted air pollutants in excess of federal limitations. PSEC violated federal limits on mercury emissions from March 29, 2021 through May 1, 2021, when its rolling daily average exceeded the relevant limit set forth in the Code of Federal Regulations. According to the Enforcement and Compliance History Online, a website database maintained by the Environmental Protection Agency, PSEC has also violated sulfur dioxide limits in the past year, with the violation reported to EPA on January 1, 2023.

56. On March 30, 2012, the Illinois EPA issued a "Construction Permit/PSD Approval" to Prairie State for the Power Plant. That Permit is attached herein as Exhibit D.

57. Standard Condition 6a of the Construction Permit requires that "a permit for operation shall be obtained from the Illinois EPA before the equipment covered by this permit is placed into operation." Condition 1.6 of the Construction Permit allows, notwithstanding this Standard Condition, Prairie State to operate "each coal boiler and associated equipment…for a

period that ends 180 days after the boiler first sends electricity to the grid to allow for equipment shakedown and required emission testing." That same condition allows "the remainder of the plant, excluding the coal boilers, [to] be operated under this construction permit for a period of 365 days after initial startup of a pulverized coal boiler." Upon successful completion of emission testing of a pulverized coal boiler, Prairie State is authorized to operate the Power Plant "as allowed by Section 39.5(5) of the [Illinois] Environmental Protection Act," *i.e.* 415 ILCS § 5/39.5.

58. The Construction Permit includes several provisions that direct Prairie State to submit further information to Illinois EPA for the purpose of developing lower limits for certain pollutants as a condition of operation. Specifically, although the limit for particulate matter with a diameter of 10 micrometers or less is initially set at 0.035 lb/million Btu, Condition 2.1.17 directs Prairie State to conduct "at least four additional emission tests," on the basis of which a lower limit not to exceed 0.018 lb/million Btu will be set. Similarly, the Construction Permit directs Prairie State to evaluate sulfur dioxide emissions from the boilers "to determine whether a lower hourly limit may be reliably achieved" and to submit a detailed written evaluation to Illinois EPA, on the basis of which the agency may set a lower limit.

59. On information and belief, Prairie State has never completed these written evaluations and Illinois EPA has never set a lower limit for sulfur dioxide emissions.

60. The Construction Permit defers certain monitoring and reporting requirements for further specification or development as part of a future CAAPP permit. Specifically:

    a. Section 2.1.2 states that compliance with control of hydrogen chloride emissions "may be further developed or revised in the CAAPP Permit issued for this plant."

16

  b. Section 2.1.5 requires PSGC to submit a Compliance Assurance Monitoring Plan for particulate matter for the plant boilers as part of its application for a CAAPP Permit.

  c. Section 2.1.8 states that, "The CAAPP Permit may establish requirements for more frequent emission testing" of particulate matter emissions than on the 30-month interval required by the Construction Permit.

61. Illinois law requires that certain limitations on mercury emissions and associated monitoring requirements be incorporated into a CAAPP permit. Ill. Admin. Code § 225.220 requires the owners or operators of any EGU that commences commercial operation after December 31, 2008 to submit a CAAPP permit application that incorporates the requirements of Subpart B of Part 225 of Title 35 of Illinois' Administrative Code, "unless the construction permit issued for the EGU addresses [those] requirements." As relevant to Prairie State, Ill. Admin. Code § 225.237 requires all owners or operators with one or more EGUs "but that previously had not had any EGUs that commenced commercial operation before January 1, 2009," to either comply with an emission standard of "0.0080 lb mercury/GWh gross electrical output; or a minimum 90 percent reduction of input mercury" on a 12-month rolling basis. Prairie State's Construction Permit for the Power Plant does not include such a limitation. Instead, the Construction Permit includes an emission limit for mercury of 0.016 lb/hour over a three-hour average (which does not apply to periods of startup and shutdown), Exhibit D at Table I, and requires Prairie State to comply with federal mercury emissions limitations, which are currently 0.013 lb/GWh on a 30-day rolling basis, *see* Table 2 of 40 C.F.R. Subpart UUUUU.

62. Prairie State applied for a CAAPP permit for the Power Plant in January 2010.

63. Illinois EPA did not issue a CAAPP permit for the Power Plant in response to this application.

64. In July 2020, Prairie State submitted a "revised CAAPP application for the Prairie State Energy Campus." In a cover letter to its submission, Prairie State stated that it "initially applied for a CAAPP permit in January 2010 and updated the application in May 2011. As of July 2020, the Illinois Environmental Protection Agency (Illinois EPA) Illinois EPA has not issued a CAAPP permit in response to this application." That cover letter is attached as Exhibit E.

65. PSGC has never obtained a CAAPP permit for the Power Plant. Nevertheless, PSGC has operated PSEC for more than ten years and continues to operate it.

## CLAIM FOR RELIEF

66. Plaintiff realleges and incorporates all preceding paragraphs as set forth herein.

67. Illinois' air quality regulations, as approved by EPA, provide that it is "unlawful for any person…to operate any CAAPP source except in compliance with a permit issued by the Agency under this Section." 415 ILCS § 5/39.5. "CAAPP source" is defined to include stationary sources that emit or have the potential to emit 100 tons per year of any air pollutant subject to regulation.

68. The Power Plant is a major stationary source under federal law and a CAAPP source under Illinois law. The Power Plant has the potential to, and has in fact emitted, more than 100 tons per year of, *inter alia*, sulfur dioxide, nitrogen oxides, and particulate matter and more than 25 tons per year of hazardous air pollutants. The plant has potential to emit more than 10 tons of hydrogen fluoride and hydrogen chloride per year and more than 25 tons in aggregate for a combination of hazardous air pollutants.

69. Prairie State has not obtained a CAAPP operating permit for the Power Plant.

70. Prairie State began operating the Power Plant without an operating permit in June 2012 and has operated it continuously since then, with the exception of the brief shutdown periods described above. Prairie State is operating and continues to operate the Power Plant without a CAAPP permit covering its emissions of criteria and hazardous pollutants. Prairie State is not operating the Power Plant in compliance with the terms and conditions that would be imposed by a CAAPP operating permit.

71. Prairie State has and continues to violate 42 U.S.C. § 7661a(a).

72. Each and every day Prairie State operates PSEC without a CAAPP permit is a separate and distinct violation of the Clean Air Act and Illinois' EPA-approved air quality regulations. Unless restrained and penalized by an order of this Court, these and similar violations will remain ongoing. These ongoing violations are enforceable under the Clean Air Act citizen suit provision, as an "emission standard or limitation" is defined, in part, as "any requirement to obtain a permit as a condition of operations." 42 U.S.C. § 7604(f)(4); § 7604(a)(1).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A. Declare that PSGC violated and is violating the Clean Air Act and Illinois' SIP and air quality regulations, and is required by these laws to obtain a CAAPP operating permit before further operating the Power Plant;

B. Enjoin PSGC from operating the Power Plant so long as the Power Plant is not in compliance with the Clean Air Act, including by obtaining the required CAAPP permit;

  C. Assess civil penalties against PSGC, as authorized by the Clean Air Act, 42 U.S.C. § 7604(a) and based on 42 U.S.C. § 7413 and 40 C.F.R. § 19.4;

  D. Order $100,000 of the civil penalties assessed against PSGC be used for beneficial mitigation projects to enhance public health and the environment in areas where Plaintiff's members live, work, and recreate and that are adversely impacted by the Power Plant's illegal emissions and operations, as authorized by 42 U.S.C. § 7604(g)(2) and as is consistent with the purposes of the Clean Air Act;

  E. Order PSGC to pay Plaintiff's costs, including reasonable attorneys' fees and expert witness fees, 42 U.S.C. § 7604(d);

  F. Retain jurisdiction of this action to ensure compliance with the Court's Order; and

  G. Provide such other relief as the court deems just and proper.

Dated this 22nd day of March, 2023

*/s/Megan Wachspress*
Megan Wachspress (CA Bar No. 310558)
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5635
megan.wachspress@sierraclub.org

*Attorney for Plaintiff*